UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NORTH AMERICAN TOWERS LLC,

      Plaintiff,

v.                           Case No. 8:20-cv-3006-VMC-AAS

CITY OF LAKELAND,

      Defendant.
_____/

**ORDER**

This matter comes before the Court upon consideration of Plaintiff North American Towers LLC's Motion for Summary Judgment (Doc. # 23) and Defendant City of Lakeland's Motion for Summary Judgment (Doc. # 24), both filed on April 30, 2021. The parties responded to each Motion on May 21, 2021. (Doc. ## 25; 26). The parties replied to each Motion on June 4, 2021. (Doc. ## 27; 28). For the reasons below, North American's Motion is denied and the City's Motion is granted.

I.   **Background**

North American services "various licensed personal wireless telecommunications providers by locating, leasing, zoning, constructing, and owning personal wireless service facilities." (Doc. # 1 at ¶ 5; Doc. # 10 at ¶ 5). North American sought to construct a 150-foot telecommunications tower on a 10.9-acre plot of land located within the City's

1

limits that it leased from Samuel and Stacy Houghton. (Doc. # 22-1 at 2; Doc. # 22-7; Doc. # 22-8; Doc. # 22-11 at 6). The Houghton property is "a heavily wooded, low lying tract of land that functions as part of the natural drainage basin for Lake Hunter." (Doc. # 22-11 at 28; Doc. # 22-16 at 3:20-22). The Houghton property's boundaries sit within 500 feet of Lake Hunter. (Doc. # 22-11 at 5). The proposed cell tower would be located "in the center of [the property, approximately] 370[ feet] from the north property line, 330[ feet] from the east property line, 300[ feet] from the south property line, and 331[ feet] from the west property line." (Doc. # 23 at ¶ 17; Doc. # 22-11 at 9; Doc. # 22-2).

On February 9, 2018, North American applied to the City to construct the cell tower on the Houghton property. (Doc. # 22-11 at 8). When the application was filed, the Houghton property was zoned Multi-Family District ("MF-12") with a future land use designation of Residential Medium. (Id.); City of Lakeland Land Dev. Code § 2.2.1 (2018). The City's Land Development Code explains that multi-family districts are intended "to provide for single-family attached and multi-family residential development at a variety of densities which are consistent with the existing and desirable future pattern of development in the city. . . .

2

The use restrictions protect multi-family residential development from the encroachment of incompatible land uses." Id. at § 2.2.3.3(a). The Code further provides that cell towers may only be built on MF-12 zoned property when the property "contain[s] a non-residential land use such as a golf course, parking lot, cemetery, church, school, electric utility substation[,] or [the property is] a vacant parcel of 50 acres or more." Id. at § 5.18.5.1(h).

Because the Houghton property did not meet either of the Code's conditions to erect a cell tower on MF-12 zoned property, North American applied to rezone it to Limited Development ("LD"). (Doc. # 22-11 at 8). The LD zoning classification "provides for rural, agricultural, conservation and recreation land uses where appropriate and where consistent with the existing and desirable future pattern of development." City of Lakeland Land Dev. Code § 2.2.3.8. Cell towers may be constructed on LD-zoned property located within 2,000 feet of a covered lake as a conditional use. (Doc. # 22-11 at 9); City of Lakeland Land Dev. Code § 5.18.5.6 ("Conditional use consideration shall be required for any ground-mounted PWS facility proposed to be located within 2,000 feet of the water line and within public view of the shores of the following lakes: Lake Beulah, Lake Bonnet,

Lake Bonny, Lake Crago, Lake Gibson, Lake Hollingsworth, Lake Holloway, Lake Hunter, Lake Mirror, Lake Morton, Lake Parker and Lake Wire.").

To be approved for a rezoning and conditional use, the petitioner must submit an application with the City, which is first reviewed by the City's staff. City of Lakeland Land Dev. Code § 12.5.4. The City's staff in turn presents a recommendation to the City's Planning and Zoning Board, which conducts a public hearing. Id. at § 12.6.1. Upon the Board's approval, the City Attorney's Office drafts the appropriate ordinances and provides them to the City Commission. Id. at § 12.6.1.3. The City Commission must consider the applications "at two separate meetings, the second of which shall be a public hearing." Id. at § 12.6.2.

Upon review, both the City's staff and the Planning and Zoning Board recommended approval of North American's rezoning and conditional use applications. (Doc. # 22-11 at 11-2). The City Attorney's Office then drafted two separate ordinances rezoning the Houghton property to LD and allowing the conditional use of the proposed cell tower. (Doc. # 22-11 at 2-25). On November 16, 2021, the City Commission held its public hearing on the adoption of both ordinances. (Doc. # 22-12; Doc. # 22-16).

4

At the hearing, Teresa Maio, an employee of the City's Community and Economic Development Department, provided background on the Houghton property. (Doc. # 22-16 at 3:16-5:2). Maio explained that the property was previously "part of the [H]istoric [D]istrict." (Id. at 4:5-6). However, in 2016, the City Commission decided to rezone the Houghton property to MF-12 because "of [its] noncontributing status as [a] historic structure[]" and "in an effort to incentivize or make it more attractive for developers to come in and potentially develop multi-family on these properties." (Id. at 4:7-14). Maio then described the size of the property, its proximity to other homes, and the scale of the proposed structure. (Id. at 4:21-5:25). Maio presented the Commission with photo simulations of the cell tower from various perspectives, noting it would "certainly be visible above the tree canopy, but the tree canopy does serve to significantly reduce the overall height of the tower." (Id. at 6:23-7:6).

The below map shows the proposed cell tower at the center of the Houghton property, with Lake Hunter to the northeast:



(Doc. # 22-12 at 10). The below representative photo simulations, which constitute four of seven submitted by North American, show the cell tower would rise above the tree canopy and would be visible from several vantage points:





 

(<u>Id.</u> at 11-17).

The Commissioners then asked Maio questions about the proposed ordinances and raised some concerns. Commissioner Madden inquired about the property's current zoning, whether it would be desirable to build housing on the property, and whether allowing this cell tower would "eclipse any future land change . . . back to multi-family." (Doc. # 22-16 at 12:23-13:2, 15:1-3). Commissioner Walker echoed this concern about potential future multi-family development. (<u>Id.</u> at 19:20-20:4). Maio responded that she had not yet received any inquiries about developing the land into multi-family housing, and that rezoning the property to LD and placing a

cell tower in the middle of it would limit development of the property in the future. (Id. at 13:23-25, 15:4-13). Maio explained:

> So I'm not sure how someone would configure a multi-family development of a significant size on this property given that this tower is sitting right in the middle. And having to deal with things such as stormwater and parking and building arrangements. To say it's impossible, I wouldn't say that. It would just be, I think, unlikely because you have the reduction in the developable area of this property.

(Id. at 20:9-17).

Thereafter, North American presented its proposal to the Commission and the Commissioners invited comments from attendees. (Id. at 21:15-26:19). One attendee opposing the ordinances noted that he lived at the Magnolia Pointe Condominiums located immediately to the east of the Houghton property and described his neighbors and the proximity of the proposed cell tower to their homes. (Id. at 26:22-29:25). Another attendee highlighted the proximity of the Houghton property to Lake Hunter, the aesthetics and visibility of the cell tower from the surrounding areas, and people's willingness to develop multi-family properties near the cell tower. (Id. at 31:6-33:11 ("And like I said earlier, we're Lakeland and we should be taking pride in our lake. And we're going to give up a piece of lake front property. . . . We're

not giving up prime real estate for multi-family, where families could go, you know, hopefully someone will develop that, build homes and families could walk over to Lake Hunter and enjoy the lake and the wildlife and boating and everything else that goes along with living in Lakeland."). Yet another attendee opposing the ordinances referred to the cell tower's "proximity to our homes, the risk of property value loss, neighborhood aesthetics and most importantly implied health concerns." (Id. at 40:1-41:16). A number other attendees noted health concerns as well. (Id. at 30:6-12, 48:3-4, 48:19-49:11, 50:8-10).

Following these comments, Commissioner Walker moved to approve the ordinances. (Id. at 52:1-4). The City Attorney then warned the Commissioners that they could not consider health concerns arising from the cell tower's frequency due to federal preemption. (Id. at 52:15-53:25). The City Attorney advised the Commissioners that they could consider "aesthetics, compatibility, and property values." (Id. at 52:25-53:6). The Commissioners then discussed their views on the ordinances. Commissioner McCarley stated that she would not support the cell tower due to the issues raised by the attendees – specifically citing to property values. (Id. at 58:15-20). Commissioner McLeod noted his belief that "this

[is not] the best use for this property" considering its "unique location[,] . . . with Lake Hunter to the . . . north and Dixieland Historic District and with Lakeland Christian [S]chool to the south." (Id. at 60:10-15). He also cited to property values. (Id. at 60:20-21). The Commissioners then voted on the motion to approve the ordinances, which failed to pass 3-2. (Id. at 67:14-18).

The Commissioners then formally explained their reasons for denying the motion:

> MAYOR MUTZ: My reason would be aesthetics versus the multiple housing -- ability to use that land for multiple housing -- multiple family housing later as a preferential space.

> COMMISSIONER MCCARLEY: My reason would be the multi-family, which I also have on the agenda study on Friday as well on having that space.

> COMMISSIONER MCLEOD: And similar, I -- aesthetics, the -- I'm not convinced on the zoning, the down zoning as Commissioner [McCarley] mentioned and the best use for that land with the surrounding areas. I don't see it as compatible with the surrounding areas. If that – you can add that in.

(Id. at 68:1-13). After further discussion by the Commissioners as to their basis for denial of the ordinances, the City Attorney sought to clarify their reasoning:

> CITY ATTORNEY: I'm sorry, to make this more difficult than it is. But the federal legislation is pretty awkward to deal with. Just the way I -- I'm reading the commission's discussion and the requirement of the federal legislation to base your

decision on evidence in the record. What I'm hearing is that your decision to deny the request is based on, you know, the testimony of the residents, the photographs that you've seen that show the proximity to the residential areas to the proposed location site impact. The aesthetic impact due to that proximity. Compatibility of that use compared to multi-family in relation to the surrounding community. That's what I'm hearing based on the evidence of the record.

MAYOR MUTZ: And a preference to leave it as the multi-family designation is a better use of that area.

CITY ATTORNEY: Due to the surrounding area --

MAYOR MUTZ: Surrounding area, yes.

CITY ATTORNEY: And the maps that you've seen and the testimony that you've heard.

MAYOR MUTZ: Yes.

(Id. at 72:23-73:18).

Shortly after the hearing, on November 19, 2020, the City Attorney formalized the Commission's reasoning for denying the applications in writing on the following grounds:

[] Based on the testimony and photographs presented by residents of surrounding neighborhoods, as well as the staff report, maps, testimony and other evidence presented by the City's planning staff, the proposed Cell Tower site is located within close proximity of a residential neighborhood, with the closest residential structure being approximately 360 feet of the Cell Tower site. Maps presented by City planning staff also show the close proximity of the Cell Tower to the Dixieland Historic District. Visual simulations of the Cell Tower submitted into the record illustrate the modern and industrial appearance of the Cell Tower.

The proximity of a cell tower of this nature to surrounding residential and historic land uses creates significant and adverse compatibility issues and would diminish the aesthetic enjoyment of the area by the residents of the affected area.

[] It is readily apparent from aerial maps of the subject site and visual simulations of the Cell Tower submitted into the record that the proposed 150-foot Cell Tower would be clearly visible from residences surrounding Lake Hunter and by citizens enjoying the recreational opportunities afforded by Lake Hunter. The City Commission was presented with testimony and evidence that several existing cell towers are already visible from Lake Hunter. Approval of the proposed Cell Tower would add an unacceptable level of visual clutter to the viewshed from Lake Hunter.

[] The current zoning for the Property is multi-family residential. Multi-family residential development on the Property is compatible with the residential land uses surrounding the Property, while the proposed Cell Tower is not.

(Doc. # 22-15 at 1-2).

North American initiated this action on December 17, 2020. (Doc. # 1). The complaint asserts the following claims against the City: declaratory relief (Count I), and injunctive relief (Count II). (Id. at 10-11). North American seeks "an order declaring the City's denial of [North American's] Applications for the Proposed Tower null and void" and "a mandatory injunction instructing the City to approve [North American's] Applications as submitted." (Id.).

The City filed its answer on February 8, 2021. (Doc. #

10). Thereafter, the parties agreed that resolution of the case would be determined by the closed record of the City Commission's proceedings concerning North American's rezoning and conditional use applications. (Doc. # 13 at 2-3). Accordingly, the parties did not engage in any additional discovery. (Id.; Doc. # 14). Now, the parties both seek entry of summary judgment in their favor. (Doc. ## 23; 24). Each party has responded (Doc. ## 25; 26) and replied. (Doc. ## 27; 28). The Motions are ripe for review.

## II.  Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if

it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the Court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846

F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his [conclusory] allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed[.]" (citation omitted)).

## III. **Analysis**

Both parties have filed Motions for Summary Judgment (Doc. ## 23; 24). The Court will begin by addressing the City's Motion, followed by North American's Motion.

## A. <u>The City's Motion</u>

The City argues that it is entitled to an entry of judgment in its favor on both counts of the complaint because its decision to deny North American's applications "was based on lack of compatibility with adjacent uses," and the City's belief that "the proposed tower was not the preferred use of the [p]roperty." (Doc. # 24 at 2). The City contends that this reasoning "was supported by substantial evidence." (<u>Id.</u>). North American responds that "aesthetics are not a proper basis to deny the rezoning application," and "[t]he Commission did not base either the rezoning or the conditional use decisions on aesthetics." (Doc. # 25 at 6-7).

"Congress enacted the [Federal Telecommunications Act of 1996] to 'promote competition and higher quality in American telecommunications services and to encourage the rapid deployment of new telecommunications technologies.'" <u>PI Telecom Infrastructure v. City of Jacksonville</u>, 104 F. Supp. 3d 1321, 1336 (M.D. Fla. 2015) (quoting <u>Michael Linet, Inc. v. Vill. of Wellington</u>, 408 F.3d 757, 761 (11th Cir. 2005)). The Act "generally preserves 'the traditional authority of state and local governments to regulate the location, construction, and modification' of wireless communications facilities like cell phone towers, but imposes 'specific

limitations' on that authority." T-Mobile S., LLC v. Roswell, 574 U.S. 293, 300 (2015) (quoting Rancho Palos Verdes v. Abrams, 544 U.S. 113, 115 (2005)). Relevant here, the Act requires that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii) (2020). "[P]arties adversely affected by a locality's decision [to deny such a request] may seek judicial review." T-Mobile, 574 U.S. at 300.

In this respect, "substantial evidence is 'more than a mere scintilla but less than a preponderance.'" PI Telecom, 104 F. Supp. 3d at 1341 (citation omitted). "[T]o determine whether a locality's denial was supported by substantial evidence, . . . courts must be able to identify the reason or reasons why the locality denied the application." T-Mobile, 574 U.S. at 300. "[T]hese reasons need not be elaborate or even sophisticated, but . . . simply clear enough to enable judicial review." Id. at 302. Courts "should view the record in its entirety, including evidence unfavorable to the state or local government's decision." Preferred Sites, LLC v. Troup Cnty., 296 F.3d 1210, 1218 (11th Cir. 2002).

"[R]eview of a local government's decision to deny a cell tower application is colored by the requirements of the local zoning ordinance." <u>Wireless Towers, LLC v. City of Jacksonville</u>, 712 F. Supp. 2d 1294, 1303 (M.D. Fla. 2010). The City's Development Code provides the following factors for the Commission to consider in weighing whether to approve the construction of a cell tower as a conditional use:

> 1. The height and visual obtrusiveness of the facility;
>
> 2. The degree of visibility from the public view;
>
> 3. The proximity of the facility to residential structures and residential district boundaries;
>
> 4. The character of the uses and structures on adjacent and nearby properties;
>
> 5. The character of the land, including topography and tree coverage;
>
> 6. The design of the facility with particular reference to design characteristics that have the effect of reducing or eliminating visual obtrusiveness;
>
> 7. The degree to which the facility reduces the proliferation of visually obtrusive structures through co-location; and
>
> 8. Competent evidence that reasonable alternatives to the proposed conditional use do not exist.

City of Lakeland Land Dev. Code § 5.18.7.c. Additionally, "[t]he party seeking to overturn the governing body's decision bears the burden of showing that the decision is not

supported by substantial evidence." PI Telecom, 104 F. Supp. 3d at 1342 (citing Am. Tower LP v. City of Huntsville, 295 F.3d 1203, 1207 (11th Cir. 2002)).

Here, both Counts I and II rest on North American's claim that "the City has failed to support its denials [of North American's rezoning and conditional use applications] with written findings of fact supported by substantial evidence," such that the City's decisions "cannot stand under the Federal Telecommunications Act." (Doc. # 1 at ¶¶ 49, 54-56). The record indicates that the City Commission based its decision to deny the construction of the cell tower on a combination of aesthetics and a desire to have the Houghton property used to develop multi-family homes. (Doc. # 22-16 at 58:15-20, 60:10-15, 68:1-13, 72:23-73:18; Doc. # 22-15 at 1-2).

Regarding the Commission's first reason, aesthetics are a proper consideration under the City's Code. See City of Lakeland Land Dev. Code § 5.18.7.c (noting that the Commission may consider the "visual obtrusiveness" of the cell tower, its "degree of visibility from public view," and its proximity to residences, among other things, in granting a conditional use). Although "citizens' generalized concerns about aesthetics are insufficient to constitute substantial evidence" under the Telecommunications Act, the Commission

was presented with "substantial evidence of the visual impact of the tower." Preferred Sites, 296 F.3d at 1219. The Commissioners reviewed photographic simulations submitted by North American showing that the proposed cell tower would be visible above the tree canopy. (Doc. # 22-12 at 11-17). Indeed, the simulations show that the cell tower would be visible well above the tree canopy from the intersection of Ariana Street, Harden Boulevard, Ariana Street, Unitah Avenue, Lake Hunter Drive, Sikes Boulevard, West Highland Street, and South Central Avenue. (Id.). One of those simulations shows the clear visibility of the tower above the tree canopy as seen by a nearby apartment complex. (Id. at 14; Doc. # 22-6 at 4:24-5:2). The maps provided to the Commission depict the proposed cell tower's proximity to Lake Hunter, residents' homes, Lakeland Christian School, and the Dixieland Historic District. (Doc. # 22-4 at 3; Doc. # 22-9; Doc. # 22-10 at 1; Doc. # 22-11 at 6-7; Doc. # 22-12 at 10, 33). And, a number of resident attendees voiced their concerns regarding the cell tower's impact on the aesthetics of Lake Hunter and the surrounding areas. (Doc. # 22-16 at 31:6-33:11, 40:1-41:16).

Taken together, this is sufficient. See PI Telecom, 104 F. Supp. 3d at 1345 ("The Commission found the proposed

tower's visual impact upon Alexandria Oaks Park significant enough to warrant denial of PI Telecom's application, a decision supported by photographic evidence. Faced with objective evidence of the visual impact, this Court cannot displace the Commission's 'fair estimate of conflicting evidence' and cannot 'freely re-weigh the evidence.'" (citation omitted)); T-Mobile S. LLC v. City of Milton, 27 F. Supp. 3d 1289, 1301-02 (N.D. Ga. 2014) (finding the aesthetic objections to the proposed cell towers supported by substantial evidence, which included balloon test evidence and nearby residents' concerns about the towers' "impact on their residences[,] . . . specific farms, equestrian facilities, and scenic highway corridors"); Se. Towers, LLC v. Pickens Cnty., 625 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008) ("Based on the evidence in the record of the specific effect the placement of the cell tower would have on the Tate Historic District, the Court concludes that the Commissioner's determination that the proposed tower would adversely impact the aesthetic harmony of the Tate Historic District was 'grounded in the specifics of the case.'" (citation omitted)); Wireless Towers, 712 F. Supp. 2d at 1303-05 ("The Planning Department and the Commission reviewed the photo simulations provided by Wireless and determined – as

argued by the 'concerned neighbor,' NPS – that the Proposed Tower would have an adverse visual impact on the surrounding area. . . . Dr. Blick conceded that some of the views were problematic, and acknowledged that over a third of the tower would be visible from Clapboard Creek's tributary, Bogey Branch. With this objective evidence before it, the Commission made a subjective determination that the Proposed Tower was incompatible with the surrounding area given its height, design, and the sensitivity of the affected land. . . . The Court concludes on the record before it that the Commission's decision was supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' (citations omitted)).

In addition to aesthetics, the Commission based its denial of North American's applications on its desire to maintain the property zoned for multi-family homes. (Doc. # 22-16 at 12:23-13:2, 15:1-3, 19:20-20:4, 31:6-33:11, 60:10-15, 68:1-13, 72:23-73:18). At the hearing, Maio explained that the Houghton property had previously been part of the City's Historic District but was rezoned MF-12 in 2016 "in an effort to incentivize or make it more attractive for developers to come in and potentially develop multi-family on these properties." (Id. at 4:7-14). A number of the

Commissioners voiced this preference. (Id. at 12:21-13:4, 15:1-3, 19:20-20:4, 21:4-5, 60:10-25, 68:1-4, 68:22-69:4, 71:3-5). The record shows that the properties surrounding and near the cell tower site include condominiums, single family homes, a school, and Lake Hunter. (Doc. # 22-16 at 4:24-2; Doc. # 22-12 at 10-17; Doc. # 22-11 at 9-10). City staff explained that the Houghton property would likely not be suitable for multi-family housing if a cell tower were erected in the middle of it. (Doc. # 22-16 at 15:1-13, 20:5-24). And although North American argues that the Houghton property is not suitable for multi-family development, it has cited to no evidence in the record holding that such development would not be possible. (Doc. # 25; Doc. # 23 at ¶ 13 (stating only that such development would be "severely limited")). Additionally, such compatibility considerations are proper under the City's Development Code. See City of Lakeland Land Dev. Code § 5.18.7.c (noting that the Commission should factor in "[t]he character of the uses and structures on adjacent and nearby properties" and "[t]he character of the land").

The Court finds that this reasoning, along with the aesthetics concerns, was based on substantial evidence. See Stout & Co. v. City of Bel Aire, No. 2:15-cv-09323-JTM, 2016 WL 3759440, at *9 (D. Kan. July 14, 2016) ("[T]here was

substantial evidence to support the council's conclusion that these factors weighed against approval of the permit. There was evidence that the proposed site is in the middle of a residential neighborhood, with single family homes a short distance away in two directions, a school and homes in a third direction, and a park with baseball diamonds in the fourth direction.").

In response to the Motion, North American argues that the City provided no basis to deny the rezoning application specifically. (Doc. # 25 at 6-7). However, North American provides no authority for the proposition that the Commission must consider the rezoning application in a vacuum, without regard to North American's clear purpose in rezoning the Houghton property to construct a cell tower, or the necessary conditional use application. (Doc. ## 23; 25). And, North American has not asserted a cause of action for a violation of its federal constitutional or state rights as to the denial of the zoning application. (Doc # 1). Rather, the entirety of the complaint is based on an alleged violation of the Federal Telecommunications Act. (Id. at ¶¶ 3, 36-56 ("This is an action for declaratory and injunctive relief pursuant to the Federal Telecommunications Act of 1996[.]")).

Lastly, the Court finds equally unavailing North

American's argument that the City unlawfully constructed its rationale for denial after-the-fact. (Doc. # 25 at 9-10). To the contrary, the Commission received and reviewed evidence prior to voting on the applications, heard a presentation both by the City Staff and North American, and received testimony by the citizen attendees. (Doc. # 22-16 at 3:16-51:20). The Commissioners discussed their reasoning both prior to and after voting, and a complete reading of the record demonstrates that the basis for the Commission's denial included aesthetic and compatibility considerations. (Id. at 12:21-13:4, 15:1-3, 60:10-25, 67:19-24, 71:3-73:19). The City Attorney's written letter of denial reiterates this reasoning as well. (Doc. # 22-15 at 1-2).

Because the Court has found that the City relied on valid reasons, in writing, and supported by substantial evidence, in denying North American's applications to construct a cell tower on the Houghton Property, the City's Motion is granted. See PI Telecom, 104 F. Supp. 3d at 1350 (finding that the Federal Telecommunications Act was not violated by the City's denial of a cell tower application where there was substantial evidence to support such denial on the basis of aesthetics).

B. **North American's Motion**

In North American's Motion, it seeks an entry of judgment

in its favor on both Counts of the complaint. (Doc. # 24). Because the Court has already found it proper to enter judgment in the City's favor on all counts, North American's Motion is denied.

Accordingly, it is

**ORDERED**, **ADJUDGED**, and **DECREED:**

(1) Defendant City of Lakeland's Motion for Summary Judgment (Doc. # 24) is **GRANTED**. Plaintiff North American Towers LLC's Motion for Summary Judgment (Doc. # 23) is **DENIED**.

(2) The Clerk is directed to enter judgment in favor of the City and against North American Towers.

(3) Thereafter, the Clerk is directed to **CLOSE** the case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>13th</u> day of July, 2021.

<em>Virginia M. Hernandez Covington</em>
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE